## EXHIBIT 1

**Purchase and Sale Agreement**

# PURCHASE AND SALE AGREEMENT

**SELLER**:

The Hercules Tire & Rubber Company

12200 Herbert Wayne Court, Suite 150
Attention:  Real Estate Department
Email: MGaither@ATD-US.com

**PURCHASER**:

Nickolas XII, LLC

c/o Nickolas L. Reinhart
6713 Township Road 212
Findlay, OH 45840

**PROPERTY**:

Parcel ID numbers 350001014311 (approximately 2.2 acres), 350001015765
(approximately 0.768 acres), 630001018541 and 630001018542 (approximately 55.835
acres in the aggregate), 630001022614 (approximately 64.454 acres)

Findlay, Ohio 45840

**DATED AS OF**:

April 27th, 2018

4386628.1
34282367v7

<u>Summary Sheet</u>

Purchaser:           Nickolas XII, LLC

Seller:              The Hercules Tire & Rubber Company

Escrow Agent:        Fidelity National Title Insurance Company

Property:            Parcel ID numbers 350001014311 (approximately 2.2 acres),
                     350001015765 (approximately 0.768 acres), 630001018541 and
                     630001018542 (approximately 55.835 acres in the aggregate),
                     630001022614 (approximately 64.454 acres)

Purchase Price:      $13,790,000.00

Initial Deposit:     $50,000.00

Additional Deposit:  $1,329,000.00

Closing Date:        December 12, 2018

INDEX

Section 1       The Property
      1.1       Description
      1.2       As-Is Purchase
      1.3       Agreement to Convey

Section 2       Price and Payment
      2.1       Purchase Price
      2.2       Payment and Closing

Section 3       Inspections
      3.1       Inspections
      3.2       Title and Survey
      3.3       Contracts
      3.4       Permitted Encumbrances
      3.5       Confidentiality
      3.6        Prior to Closing
      3.7       Damage, Destruction or Condemnation

Section 4       Representations and Warranties
      4.1       By Seller
      4.2       By Purchaser
      4.3       Brokerage
      4.4       Best Knowledge; Received Written Notice

Section 5       Costs and Prorations
      5.1       Purchaser's Costs
      5.2       Seller's Costs
      5.3       Intentionally Deleted
      5.4       Taxes
      5.5       In General
      5.6       Intentionally Deleted
      5.7       Purpose and Intent

Section 6       Notices

Section 7       Closing and Escrow
      7.1       Escrow Instructions
      7.2       Seller's Deliveries
      7.3       Purchaser's Deliveries
      7.4       Insurance
      7.5       Utility Service and Deposits

4386628 .1
34282367v7

Section 8    Default; Failure of Condition
    8.1    Purchaser Default
    8.2    Seller Default

Section 9    Miscellaneous
    9.1    Entire Agreement
    9.2    Severability
    9.3    Applicable Law
    9.4    Assignability
    9.5    Successors Bound
    9.6    No Public Disclosure
    9.7    Captions
    9.8    Attorneys' Fees
    9.9    No Partnership
    9.10    Time of Essence
    9.11    Counterparts
    9.12    Recordation
    9.13    Proper Execution
    9.14    Merger
    9.15    Limited Recourse
    9.16    Intentionally Deleted
    9.17    Survival of Representations and Warranties; Limitation of Liability
    9.18    Like-Kind Exchange

List of Exhibits

Exhibit A    Depiction of Land
Exhibit B    Inventory of Personal Property
Exhibit C    Schedule of Contracts
Exhibit D    Form of Deed
Exhibit E    Form of Assignment and Assumption of Contracts
Exhibit F    Form of Assignment of Warranties and Guarantees

4386628..1
34282367v7

PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement"), dated as of the ____ day of April, 2018 (the "Effective Date"), is made by and between THE HERCULES TIRE & RUBBER COMPANY, a Connecticut corporation ("Seller"), and NICKOLAS XII, LLC, an Ohio limited liability company ("Purchaser").

RECITALS:

Seller desires to sell certain improved real property located in Findlay, Ohio, along with certain related intangible property, and Purchaser desires to purchase such real property and intangible property, all as more particularly described and agreed upon below.

NOW, THEREFORE, in consideration of the foregoing, of the covenants, promises and undertakings set forth herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree as follows:

1.    The Property.

1.1    Description:  Subject to the terms and conditions of this Agreement, and for the consideration herein set forth, Seller agrees to sell and transfer, and Purchaser agrees to purchase and acquire, all of Seller's right, title, and interest in and to the following (collectively, the "Property"):

1.1.1    That certain land located in Findlay, Ohio, and identified by Parcel ID numbers 350001014311 (approximately 2.2 acres), 350001015765 (approximately 0.768 acres), 630001018541 and 630001018542 (approximately 55.835 acres in the aggregate), 630001022614 (approximately 64.454 acres), and more specifically described in Exhibit A attached hereto (the "Land") (with it being acknowledged, however, that Parcel ID 350001015765 is not specifically identified on Exhibit A;

1.1.2    The buildings, parking areas, improvements, and fixtures now situated on the Land, but specifically excluding the Personal Property (as hereafter defined) (the "Improvements");

1.1.3    All easements, hereditaments, and appurtenances belonging to or inuring to the benefit of Seller and pertaining to the Land, if any;

1.1.4    Any street or road abutting the Land to the center lines thereof;

1.1.5    The contracts and agreements relating to the operation, improvement or maintenance of the Land, the Improvements and described in Exhibit C attached hereto (the "Contracts"), subject to the provisions of Section 3.3;

1.1.6    Assignable warranties and guaranties issued in connection with the Improvements; and

1.1.7    All transferable consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Land or the Improvements.

1.2    "As-Is" Purchase

4386628 .1
34282367v7

1.2.1    No person acting on behalf of Seller is authorized to make, and by execution hereof, Purchaser acknowledges that no person has made, any representation, agreement, statement, warranty, guarantee or promise regarding the Property or the transaction contemplated herein or the zoning, construction, physical condition or other status of the Property except as may be expressly set forth in this Agreement. No representation, warranty, agreement, statement, guarantee or promise, if any, made by any person acting on behalf of Seller which is not contained in this Agreement will be valid or binding on Seller.

1.2.2    PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (I) VALUE; (II) THE INCOME TO BE DERIVED FROM THE PROPERTY; (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, INCLUDING, WITHOUT LIMITATION, THE POSSIBILITIES, IF ANY, FOR FUTURE DEVELOPMENT OF THE PROPERTY; (IV) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (V) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (VI) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE INDOOR AND OUTDOOR ENVIRONMENT AIR QUALITY, WATER, SOIL AND GEOLOGY; (VII) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (VIII) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (IX) COMPLIANCE WITH ANY FEDERAL, STATE, AND LOCAL ENVIRONMENTAL PROTECTION, POLLUTION, HEALTH AND SAFETY OR LAND USE LAWS, RULES, REGULATIONS, ORDINANCES, ORDERS, REQUIREMENTS OR COMMON LAW, INCLUDING, WITHOUT LIMITATION, TITLE III OF THE AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED, THE FEDERAL WATER POLLUTION CONTROL ACT, AS AMENDED, THE RESOURCE CONSERVATION AND RECOVERY ACT, AS AMENDED, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, THE SAFE DRINKING WATER ACT, AS AMENDED, THE HAZARDOUS MATERIALS TRANSPORTATION ACT, AS AMENDED, THE OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970, AS AMENDED, THE TOXIC SUBSTANCE CONTROL ACT, AS AMENDED, AND REGULATIONS PROMULGATED UNDER ANY OF THE FOREGOING AND ANALOGOUS STATE STATUTES AND REGULATIONS; (X) THE PRESENCE OR ABSENCE OF HAZARDOUS OR TOXIC MATERIALS, SUBSTANCES OR WASTE AT, ON, UNDER, OR ADJACENT TO THE PROPERTY; (XI) THE CONTENT, COMPLETENESS OR ACCURACY OF THE DUE DILIGENCE MATERIALS OR PRELIMINARY REPORT REGARDING TITLE; (XII) THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY INCLUDING ANY PLANS AND SPECIFICATIONS THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER; (XIII) THE CONFORMITY OF THE PROPERTY TO PAST, CURRENT OR FUTURE APPLICABLE ZONING OR BUILDING REQUIREMENTS; (XIV) DEFICIENCY OF ANY UNDERSHORING, (XV) DEFICIENCY OF ANY DRAINAGE; (XVI) THE FACT THAT ALL OR A PORTION OF THE PROPERTY MAY BE LOCATED ON OR NEAR AN EARTHQUAKE FAULT LINE; (XVII) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE PROPERTY; OR (XVIII) WITH RESPECT TO ANY OTHER MATTER. PURCHASER SHALL RELY SOLELY ON ANY REPRESENTATIONS AND

6

WARRANTIES SET FORTH IN THIS AGREEMENT, ITS OWN INVESTIGATION OF THE PROPERTY AND REVIEW OF SUCH INFORMATION AND DOCUMENTATION OBTAINED BY PURCHASER DURING ITS INVESTIGATIONS. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION MADE AVAILABLE TO PURCHASER OR PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLER WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.  SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS, AND THAT SELLER HAS NO OBLIGATION TO MAKE REPAIRS, REPLACEMENTS OR IMPROVEMENTS EXCEPT AS MAY OTHERWISE BE EXPRESSLY STATED HEREIN.   PURCHASER REPRESENTS, WARRANTS, AND COVENANTS TO SELLER, WHICH REPRESENTATION, WARRANTY, AND COVENANTS TO SELLER SHALL SURVIVE THE CLOSING AND NOT BE MERGED WITH THE DEED (AS HEREINAFTER DEFINED). THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SPECIFIED IN THIS AGREEMENT, PURCHASER IS RELYING SOLELY UPON PURCHASER'S OWN INVESTIGATION OF THE PROPERTY.

1.2.3    Nothing contained in this Agreement shall be construed as authorizing Purchaser to apply for a zoning change, variance, subdivision map, lot line adjustment or other discretionary governmental act, approval or permit with respect to the Property prior to the Closing, and Purchaser agrees not to do so without Seller's prior written approval, which approval shall not be unreasonably withheld. Purchaser agrees not to submit any reports, studies or other documents, including, without limitation, plans and specifications, impact statements for water, sewage, drainage or traffic, environmental review forms, or energy conservation checklists to any governmental agency, or any amendment or modification to any such instruments or documents prior to the Closing unless first approved by Seller, which approval Seller may not unreasonably withhold.  Purchaser's obligation to purchase the Property shall not be subject to or conditioned upon Purchaser's obtaining any variances, zoning amendments, subdivision maps, lot line adjustment, or other discretionary governmental act, approval or permit.

1.2.4    Intentionally deleted.

1.2.5    Purchaser shall indemnify, defend, protect and hold harmless Seller and Seller's parent company, if any, and their respective affiliates and subsidiaries, and their respective direct and indirect members, partners, directors, officers, participants, employees, consultants, advisers, managers and agents, from and against any and all damages, losses, liabilities, costs or expenses whatsoever (including attorneys' fees and costs) and claims therefor (collectively, "Claims"), whether direct or indirect, known or unknown, or foreseen or unforeseen, which may arise from or be related to Purchaser's due diligence and other activities on or at the Property, including, but not limited to, the acts or omissions of Purchaser or its employees. agents, suppliers or contractors.  Purchaser's obligations hereunder shall survive the Closing and shall not be merged with the Deed.

4386628.1
34282367v7

1.2.6    Purchaser and Seller acknowledge and agree that all furniture, trade fixtures, racking, personal property, machinery, apparatus, and equipment owned or leased by Seller and used in the operation, repair and maintenance of the Land and the Improvements and situated thereon (collectively, the "Personal Property"), including, but not limited to, the personal property described on Exhibit B, is not a part of the conveyance contemplated under this Agreement. For the avoidance of doubt, the building systems (e.g., HVAC and plumbing) do not constitute Personal Property for purposes of this transaction. Seller will remove its Personal Property from the Property on or before Closing, and Seller will repair any material damage to the Property as result of any such removal.

1.3    Agreement to Convey.  Seller agrees to convey, and Purchaser agrees to accept, title to the Land and the Improvements by a limited warranty deed in the form attached hereto as Exhibit D (the "Deed") in the condition described in Section 3.4.

2.    Price and Payment.

2.1    Purchase Price.  The purchase price for the Property ("Purchase Price") is THIRTEEN MILLION SEVEN HUNDRED NINETY THOUSAND AND 00/100 DOLLARS ($13,790,000.00).

2.2    Payment and Closing.  Payment of the Purchase Price is to be made in cash as follows:

2.2.1    (a) Purchaser shall make an earnest money deposit of FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) (together with interest earned thereon, the "Initial Deposit") to the Title Company (as defined below) not later than two (2) business days following the Effective Date. The failure of Purchaser to deliver the Initial Deposit to the Title Company within two (2) business days following the Effective Date shall be a material default hereunder, and upon notice from Seller to Purchaser prior to the delivery of the Initial Deposit, this Agreement shall terminate and neither party hereunder shall have any further rights hereunder. If Purchaser does not terminate this Agreement on or before the end of the Due Diligence Period (hereafter defined), then no later than the second (2nd) business day following the end of the Due Diligence Period, Purchaser shall deliver to the Title Company the sum of ONE MILLION THREE HUNDRED TWENTY-NINE THOUSAND AND 00/100 DOLLARS ($1,329,000.00) in immediately available funds (together with any interest earned thereon, the "Additional Deposit"), which sum, together with interest earned thereon, shall be deemed part of the Deposit for all purposes under this Agreement. Purchaser's failure to deliver the Additional Deposit as required by the immediately preceding sentence shall be a material default by Purchaser under this Agreement. The Initial Deposit and Additional Deposit (together with all interest earned thereon) shall be non-refundable to Purchaser and immediately deemed earned by Seller for all purposes hereunder, subject only to the applicable provisions of Sections 3.1, 3.7.1, 4.1, and 8.2 hereof. The Initial Deposit and Additional Deposit are hereinafter referred to collectively or individually, as the context may require, as the "Deposit".

(b)    The Deposit, when paid, will be placed and held in escrow by Fidelity Title Insurance Company, Attn: Susan Regis Gibson, Senior National Title Coordinator, 4111 Executive Parkway, Suite 304, Westerville, Ohio 43081, E-Mail: susang.gibson@fnf.com (the "Title Company") in an interest-bearing account at a financial institution approved by the parties.

(c)    Any interest earned by the Deposit shall be considered as part of the Deposit. Except as otherwise provided in this Agreement, the Deposit will be applied to the Purchase Price at the Closing.

2.2.2    At the Closing, Purchaser shall pay the Purchase Price, exclusive of the Deposit and subject to adjustment for the prorations as provided herein, to a bank account designated by Seller via

8

wire transfer in immediately available funds.  Payment of the Purchase Price and the closing hereunder (the "Closing") will take place pursuant to an escrow closing on December 12, 2018 ("Date of Closing"), through the offices of the Title Company at noon eastern time (and the net proceeds due Seller shall be wired to Seller not later than 5:00 P.M. eastern time on the Date of Closing) or at such other time and place as may be agreed upon in writing by Seller and Purchaser.

3.      Inspections.

        3.1      Inspections.  Within five (5) business days after the date of this Agreement, to the extent available, Seller shall provide to Purchaser the following reports, assessments and other analyses and documents (to the extent in Seller's or its property manager's possession): (I) Seller's latest environmental audit; (II) Seller's most current survey of the Property; (III) any maintenance contracts entered into by Seller for the Property, including HVAC reports, with contacts at the applicable maintenance companies; (IV) copies of utility bills, real estate tax bills or any other bills for the Improvements paid by Seller during the most recent six (6) month period; (V) copies of all operating licenses and permits required by all governmental agencies regarding the Property and procured by Seller (i.e., fire alarm permits and testing verification of fire systems, parking licenses, and other applicable licenses and permits); and (VI) any other information that Purchaser has reasonably requested on or prior to the date of the Agreement regarding the economic performance of the Improvements or condition of the Improvements.  Except as may be expressly set forth in this Agreement, Seller makes no representations or warranties as to the truth, accuracy or completeness of any materials, data or other information supplied to Purchaser in connection with Purchaser's inspection of the Property (e.g., that such materials are complete, accurate or the final version thereof, or that all such materials are in Seller's possession).   Except as otherwise expressly provided in this Agreement, it is the parties' express understanding and agreement that such materials are provided only for Purchaser's convenience in making its own examination and determination as to whether it wishes to purchase the Property, and, in doing so, Purchaser shall rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on any materials supplied by Seller.  Purchaser and its invitees and agents shall have the right, during the period (the "Due Diligence Period") beginning on the Effective Date and ending at 5:00 p.m. eastern time on the date which is sixty (60) days after the Effective Date, to enter upon the Property to conduct all inspections and investigations of the condition and all other aspects of the Property which it may reasonably deem necessary or desirable (collectively, "Inspections"), including, but not limited to, the performance of surveys, non-invasive tests, studies, inquiries, investigation and reviews relating to the Property, and the right to review and copy all Contracts, warranties and other information in Seller's possession regarding the Property (provided, however, (i) Purchaser may not perform any so-called "Phase II" environmental or other invasive testing without Seller's consent, which may not be unreasonably withheld, unless and only to the extent Purchaser's "Phase I" environmental assessment recommends such "Phase II" testing, and (ii) Purchaser shall provide Seller with at least forty-eight (48) hours prior written notice of any entry on the Property by Purchaser or its agents, employees, or contractors in connection with any Inspections).   Purchaser shall protect, defend, indemnify and hold Seller and their respective affiliates and subsidiaries, and their respective direct and indirect members, partners, directors, officers, participants, employees, consultants, advisers, managers and agents free and harmless from and against any and all claims (including third party claims), demands, liabilities, damages, costs and expenses, including, without limitation, investigatory expenses, clean-up costs and reasonable attorneys' fees of whatever kind or nature arising from or in any way connected with the Inspections.  Purchaser's obligations of indemnity set forth herein shall survive the Closing and shall not be merged with the Deed. If Purchaser, in its sole and absolute discretion, desires not to purchase the Property for any reason or no reason, then Purchaser may terminate this Agreement by providing written notice thereof to Seller at any time on or prior to the date of expiration of the Due Diligence Period, whereupon the Deposit (including any interest earned thereon) shall be returned to

9

4386628.1
34282367v7

Purchaser, this Agreement shall terminate and neither party hereto shall have any liability to the other except for Purchaser's obligations under Sections 1.2.5, 3.1 and 3.5 hereof. In the event of such termination by Purchaser, Purchaser shall forward to Seller copies of all reports, assessments and surveys prepared in connection with Purchaser's inspections hereunder.

      3.2    Title and Survey. Purchaser shall cause the Title Company to issue a commitment for a policy of title insurance relative to the Property (the "Title Commitment") within thirty (30) days after the Effective Date (and shall deliver a copy of same to Seller prior to the expiration of said period), and Purchaser shall also be responsible for obtaining a survey of the Property ("Survey"). On or prior to 5:00 p.m. eastern time on the date which is ten (10) days prior to the expiration of the Due Diligence Period, Purchaser shall notify Seller, in writing, of such objections as Purchaser may have to anything contained in the Title Commitment and the Survey. All matters of record, as well as all matters which would be shown by a current, accurate ALTA survey of the Property to which, in either case, Purchaser does not object during the Due Diligence Period will be deemed a "Permitted Encumbrance" hereunder; provided, however, Purchaser shall be permitted to raise as title objections (within five (5) business days of Purchaser being notified thereof) matters affecting title of which Purchaser receives notice by an amendment or update of the Title Commitment (but only to the extent any such matters were not affecting title as of the Effective Date). In the event Purchaser notifies Seller of objections to title or survey matters prior to the applicable deadline date as aforesaid, Seller will have the right, but not the obligation, to cure such objections (except that Seller shall be obligated to cure all Monetary Liens (as defined herein)). Within five (5) days after receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing if Seller elects to cure such objections or if Seller elects not to cure such objections ("Seller's Cure Notice"). If Seller provides no notice, then Seller shall be deemed to have elected not to cure. If Seller elects to cure such objections, Seller will have until the date of Closing to remove, satisfy or cure the same (including, without limitation, by bonding over the applicable exception). If Seller elects not to cure such objections, Purchaser shall have the following options: (i) to accept a conveyance of the Property subject to those certain matters objected to by Purchaser which Seller is unwilling to cure, and without reduction of the Purchase Price; or (ii) to terminate this Agreement by sending written notice thereof to Seller within five (5) days after receipt of Seller's Cure Notice (or if, applicable, within five (5) days after the date Seller is deemed to have elected not to cure the applicable objections). Upon delivery of such notice of termination, this Agreement will terminate and the Deposit (including any interest earned thereon) shall be returned to Purchaser, and thereafter neither party hereto will have any further rights, obligations or liabilities hereunder except this Agreement shall terminate and neither party hereto shall have any liability to the other, except for Purchaser's obligations under Sections 1.2.5, 3.1 and 3.5 hereof. Seller shall be obligated to pay off at Closing any mortgages and other liens securing the payment of money created or suffered to be created by, or arising out of the acts or omissions of, Seller and which may be cured or removed by the payment of money ("Monetary Liens").

      3.3    Contracts. Prior to the expiration of the Due Diligence Period, Purchaser shall notify Seller as to which Contracts, if any, Purchaser will assume and which Contracts shall be terminated by Seller at Closing (those contracts to be assumed by Purchaser at Closing as herein provided, collectively, the "Assumed Contracts"). Notwithstanding the foregoing or any other provision herein to the contrary, the Assumed Contracts shall include the Contracts listed on Exhibit C as being Contracts that are not terminable at Closing. Purchaser will assume the obligations first accruing and arising from and after the Closing Date under the Assumed Contracts, and Seller shall terminate all other Contracts at or prior to Closing. Seller shall terminate at Closing, and Purchaser shall not assume, any property management affecting the Property.

      3.4    Permitted Encumbrances. Purchaser shall be deemed to have approved the state of title to the Property and to have agreed to purchase the Property subject to the following:

10

4386628 .l
34282367v7

3.4.1   All matters deemed to be Permitted Encumbrances pursuant to Section 3.2 hereof;

3.4.2   the Assumed Contracts and all contracts described in Section 3.6.3;

3.4.3   the lien of non-delinquent ad valorem taxes and assessments, subject to the proration provisions hereof;

3.4.4   any service, installation, connection, maintenance or construction charges due after the Closing, and subject to the proration provisions hereof, for sewer, water, electricity, telephone, cable television or gas;

3.4.5   governmental laws, codes, ordinances, and restrictions now or hereafter in effect in so far as these affect the Property, which includes without limitation, applicable zoning, subdivision, building and other land use laws and regulations; and

3.4.6   all matters, whether or not of record, that arise out of the actions of Purchaser or its agents, representatives or contractors.

All of the foregoing are referred to herein collectively as "Permitted Encumbrances".

3.5   Confidentiality.  Unless Seller specifically and expressly otherwise agrees in writing, Purchaser agrees that all information regarding the Property of whatsoever nature made available to it by Seller or Seller's agents or representatives ("Proprietary Information") is confidential and shall not be disclosed to any other person except those assisting Purchaser with the transaction, or Purchaser's lender, if any, and then only upon Purchaser making such person aware of the confidentiality restriction and procuring such person's agreement to be bound thereby.  In the event the purchase and sale contemplated hereby fails to close for any reason whatsoever, Purchaser agrees to return to Seller, or cause to be returned to Seller, all Proprietary Information as well as all third party reports obtained by Purchaser in connection with its due diligence and investigation of the Property.  Further, Purchaser agrees not to use or allow to be used any Proprietary Information for any purpose other than to determine whether to proceed with the contemplated purchase, or if same is consummated, in connection with the operation of the Property post-Closing.  Notwithstanding any other term of this Agreement, the provisions of this Section 3.5 shall survive the Closing or the termination of this Agreement.

3.6   Prior to Closing.  Until the Closing, Seller or Seller's agents:

3.6.1   Shall keep the Property insured against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

3.6.2   Shall operate and maintain the Property in a businesslike manner and substantially in accordance with Seller's past practices with respect to the Property, and make any and all repairs and replacements reasonably required to deliver the Property to Purchaser at the Closing in its present condition, normal wear and tear excepted, provided that in the event of any loss or damage to the Property as described in Section 3.7, Seller shall have an obligation to Purchaser to repair the Property only if Seller so elects and then shall be obligated only to the extent of available insurance proceeds.

3.6.3   Shall enter into only those third party contracts which are necessary to carry out its obligations under Section 3.6.2 and which shall be cancelable on thirty (30) days written notice without penalty.  If Seller enters into any such contract, it shall promptly provide written notice thereof to

11

Purchaser and unless Purchaser, within seven (7) days thereafter, notifies the respective Seller in writing of its intention to assume such contract, it shall not be treated as a contract assumed by Purchaser under Section 3.3 hereof.

3.7    Damage, Destruction or Condemnation.

3.7.1    If, prior to the Closing, the building(s) on the Property are damaged by a casualty event to the extent that the cost to restore such damage would be in excess of $500,000.00, or if any portion of such building(s) are taken under power of eminent domain, or if any portion of access to the Land or if any portion of the Land itself is taken under power of eminent domain, Purchaser may elect to terminate this Agreement by giving written notice of its election to Seller within fourteen (14) days after receiving notice of such destruction or taking. If Purchaser does not give such written notice within such fourteen (14) day period, this transaction shall be consummated on the date and at the Purchase Price provided for in Section 2, and Seller will assign to Purchaser the physical damage proceeds of the insurance policy(ies) payable to Seller, or Seller's portion of any condemnation award, in both cases, up to the amount of the Purchase Price (less any amounts actually expended by Seller prior to Closing in restoring the Property); and, if an insured casualty, pay to Purchaser the amount of any deductible but not to exceed the amount of the loss.

3.7.2    If, prior to the Closing, a casualty event or taking occurs but such casualty or taking event does not give rise to a termination right in favor of Purchaser as described in Section 3.7.1 above, Purchaser shall close this transaction on the date and at the Purchase Price agreed upon in Section 2, and Seller will assign to Purchaser the physical damage proceeds of any insurance policies payable to Seller, or Seller's portion of any condemnation award, in both cases, up to the amount of the Purchase Price (less any amounts actually expended by Seller prior to Closing in restoring the Property); and, if an insured casualty, pay to Purchaser the amount of any deductible but not to exceed the amount of the loss.

4.    Representations and Warranties.

4.1    By the Seller.  Seller represents and warrants to Purchaser that:

4.1.1    "Seller" is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut. The execution of this Agreement by Seller and the performance by Seller of its obligations hereunder shall have been duly authorized, and the execution and performance of this Agreement by Seller will not (a) violate any material term of its organizational documents or (b) require the consent of any third party (including, without limitation, the consent of any direct or indirect owner of Seller) or such consent has, as of the date hereof, been obtained by Seller.

4.1.2    Seller will, prior to the Closing, operate and maintain the Property in a businesslike manner and substantially in accordance with Seller's past practices with respect to the Property.

4.1.3    Seller is not a person or entity described by Section 1 of the Executive Order (No. 13224) Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (September 24, 2001), or whose name appears on the United States Treasury Department's Office of Foreign Assets Control most current list of "Specifically Designated National and Blocked Persons", and does not engage in any dealings or transactions, and is not otherwise associated, with any such persons or entities.

4386625.1
34282367v7

4.1.4    Except to the extent disclosed to Purchaser in writing or in the materials made available to Purchaser for its review prior to the date hereof, to Seller's knowledge, Seller has not received written notice of any proposed special assessments which would affect the Land or the Improvements.

4.1.5    To Seller's knowledge, Seller has not received written notice from any governmental authority having jurisdiction over the Property stating that the Property is in violation of any zoning, building, fire, health code, statutes, ordinances, rules, or regulations and which remains uncured.

4.1.6    To Seller's knowledge, Seller has not received written notice from any governmental authority having jurisdiction over the Property stating that the Property is in violation of any Environmental Law which remains uncured.  As used herein, "Environmental Law" means, collectively, (1) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA") (41 U.S.C. § 9601 et seq.) the Resource Conservation and Recovery Act, 42 U.S.C. § § 6901 et seq. ("RCRA"), and the Toxic Substances Control Act, as amended ("TSCA") (15 U.S.C. § 2601 et seq.); and (2) any other federal, state or local laws, ordinances, statutes, codes, rules, regulations, orders or decrees now or hereinafter in effect relating to (A) pollution, (B) the protection or regulation of human health, natural resources or the environment, (C) the treatment, storage or disposal of Hazardous Materials, or (D) the emission, discharge, release or threatened release of Hazardous Materials into the environment.  As used herein, "Hazardous Materials" means, collectively, any chemical, waste, or other material that is or contains (1) any "hazardous substance" as now or hereafter defined in, § 101(14) of CERCLA or any regulations promulgated under CERCLA; (2) any "hazardous" or "toxic" waste as now or hereafter defined in RCRA or any regulations promulgated under RCRA; (3) any substance now or hereafter regulated by TSCA or any regulations, rule, order or requirement promulgated under TSCA; (4) petroleum, petroleum by products, gasoline, diesel fuel, or other petroleum hydrocarbons; (5) asbestos and asbestos-containing material in any form, whether friable or non-friable; (6) polychlorinated byphenyls; or (7) lead and lead-containing products.

4.1.7    To Seller's knowledge, there are no condemnation, zoning or other land-use regulation proceedings, either instituted, or planned to be instituted, with respect to the Property which would adversely affect the use and operation of the Property for its intended purpose or the value of the Property, nor has Seller received notice of any special assessment proceedings affecting the Property.

4.1.8    To Seller's knowledge, Seller is not a party defendant in any legal proceedings relating to the Property (and has not received any written notice of any threatened legal proceeding relating to the Property) which, if adversely determined, would have a material adverse effect on the Property or would prevent Seller from consummating the transaction contemplated.

4.1.9    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under federal or state bankruptcy law is pending against Seller.

4.1.10   Seller has provided Purchaser a true and complete copy of each of the Contracts (to the extent in Seller's possession), and the list of Contracts on Exhibit C is, to Seller's knowledge, true and complete.  Seller has not sent a default notice to any such contract party which remains uncured.  Seller has not received written notice from any such contract party of a default by Seller under any Contract which default by Seller remains uncured.

4.1.11   Seller has no employees and has entered into no collective bargaining agreements or labor agreements relating to the operation of the Property or to which Seller and/or the Property is bound.

4.1.12   Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code.

13

4.1.13  Seller has no boundary or water drainage disputes with the owners of adjacent property.

Seller shall have no liability with respect to a breach of the representations and warranties set forth above to the extent that Purchaser proceeds with the closing of the transaction contemplated hereby with actual knowledge of such breach.  All representations and warranties of Seller hereunder shall be deemed modified from time to time to reflect any such actual knowledge of Purchaser gained prior to Closing.

The foregoing representations and warranties shall be deemed to have been reaffirmed and restated by Seller as of the Closing Date, as described in Section 7.2.7 below, subject to any change in any of the foregoing representations or warranties or any immaterial breach thereof that occurs.  Seller shall give Purchaser prompt written notice of any material change in any of the foregoing representations or warranties or any material breach thereof that occurs prior to the Closing (each a "Disclosure" and collectively, the "Disclosures"), which Disclosures shall thereafter be updated by Seller prior to the Closing Date (and the affected representations and warranties shall at Closing be deemed updated by such Disclosures, subject to Purchaser's termination right described below). If any change in any of the foregoing representations or any breach of any of the foregoing warranties or agreements is a material change or breach, and Seller does not elect to cure such matters within ten (10) business days after Seller's receipt of a written request from Purchaser to do so (which ten (10) business day period shall, to the extent applicable, extend the Closing Date), then Seller shall provide written notice to Purchaser of its election not to cure such matters. Notwithstanding anything contained herein to the contrary, if Seller elects not to cure such matters, Purchaser, at its sole option, and as its sole remedy, may either (a) close and consummate the transaction contemplated by this Agreement on the Closing Date, without reduction in the Purchase Price or (b) terminate this Agreement by written notice to Seller, whereupon the Title Company shall return the Deposit to Purchaser and the parties shall have no rights or obligations hereunder, except for those that expressly survive any such termination. Such election shall be made by Purchaser within five (5) business days after receipt of written notice from Seller that Seller has elected not to cure such material change or breach. Failure of Purchaser to deliver to Seller a notice of such election of Purchaser within such five (5) business day period shall conclusively be construed as Purchaser's having elected alternative (a) above. The Closing Date shall be postponed automatically, if necessary, to permit the full running of such period. Notwithstanding the foregoing, in the event Seller willfully caused the material change or breach, Seller shall be in default hereunder and Purchaser shall have the rights and remedies set forth in Section 8.2 hereof. As used in this Section 4, a breach or change in a representation or warranty of Seller hereunder shall be "material" if the same has, or will have, a material adverse effect on the value of the Property.

4.2 By Purchaser.  Purchaser represents and warrants to Seller that:

4.2.1  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio, has duly authorized the execution and performance of this Agreement, and such execution and performance will not violate any material term of its organizational documents.

4.2.2  Purchaser is acting as principal in this transaction with authority to close the transaction.

4.2.3  No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or State bankruptcy laws is pending against or contemplated by Purchaser.

4386628 .1
34282367v7

4.2.4    Unless otherwise disclosed to Seller in writing, neither Purchaser nor any affiliate of or principal in Purchaser is other than a citizen of, or partnership, corporation or other form of legal person domesticated in the United States of America.

4.2.5    Purchaser shall not use the assets of an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and covered under Title I, Part 4 of ERISA or Section 4975 of the Code of 1986 in the performance or discharge of its obligations hereunder, including the acquisition of the Property. Purchaser shall not assign its interest hereunder to any person or entity which does not expressly make this covenant and warranty for the benefit of Seller.

4.2.6    Purchaser is not a person or entity described by Section 1 of the Executive Order (No. 13224) Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (September 24, 2001), or whose name appears on the United States Treasury Department's Office of Foreign Assets Control most current list of "Specifically Designated National and Blocked Persons", and does not engage in any dealings or transactions, and is not otherwise associated, with any such persons or entities.

4.3    Brokerage. Each of Seller and Purchaser represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary, other than Industrial Property Brokers, LLC ("Purchaser's Broker") and Jackson Cooksey and Newmark Real Estate of Ohio, LLC dba Newmark Knight Frank (collectively, "Seller's Broker"), in connection with the Agreement or the sale of the Property. Seller and Purchaser agree that each will indemnify, defend and hold the other free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Seller or Purchaser, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale of the Property. If and only if the sale of the Property closes as contemplated under the terms of this Agreement, Seller shall be responsible for payment of a commission to Seller's Broker pursuant to a separate agreement between Seller and Seller's Broker (the parties acknowledging that any commission due to Purchaser's Broker shall be paid by Seller's Broker pursuant to a separate written agreement between Seller's Broker and Purchaser's Broker).

4.4    Best Knowledge; Received Written Notice. Whenever a representation or warranty is made in this Agreement on the basis of Seller's knowledge, or whether Seller has received written notice, such representation, warranty or other statement is made with the exclusion of any facts disclosed to or otherwise known by Purchaser or its agents, and is made solely on the basis of the current, conscious, and actual, as distinguished from implied, imputed and constructive, knowledge on the date that such representation or warranty is made, without inquiry or investigation or duty thereof, of Daniel Lacouture, without attribution to such specific officers of facts and matters otherwise within the personal knowledge of any other representatives or employees of Seller or third parties, including but not limited to, property managers of the Property, and excluding, whether or not actually known by such specific officer, any matter known to Purchaser or its agents at the time of Closing. In this regard, qualifying Seller's knowledge shall in no event give rise to any personal liability on the part of Daniel Lacouture or any other representative or employee of Seller. The representations and warranties of Seller shall survive Closing for a period of twelve (12) months following Closing.

5.    Costs and Prorations.

4386628.1
34282367v7

5.1    Purchaser's Costs.  Purchaser will pay (or reimburse Seller for) the following costs of closing this transaction:

5.1.1    The fees and disbursements of its counsel, inspecting architect and engineer, if any, and all other costs of or related to Purchaser's Inspections;

5.1.2    One-half (½) of any escrow and closing fees to the Title Company;

5.1.3    The cost of the Survey, and the costs of any other survey or any environmental study of the Property obtained by Purchaser;

5.1.4    All expenses pertaining to any financing obtained by Purchaser;

5.1.5    All recording fees payable in connection with the recording of the Deed or other documents recorded in connection with the transaction;

5.1.6    [intentionally deleted];

5.1.7    The costs of title insurance policy endorsements and any costs of a mortgagee policy for Purchaser's lender; and

5.1.8    Any other expense(s) incurred by Purchaser or its representative(s) in inspecting or evaluating the Property or closing this transaction.

5.2    Seller's Costs.  Seller shall pay:

5.2.1    The fees and disbursements of Seller's counsel;

5.2.2    One-half (½) of any escrow fees;

5.2.3    The cost of any title search and the costs of the title insurance policy premium for Purchaser's owner's policy of title insurance (excluding, however, any costs which are Purchaser's responsibility pursuant to Section 5.1 above, including, without limitation, Section 5.1.7);

5.2.4    The cost of extinguishing and Monetary Liens

5.2.5    The commission as described in Section 4.3 above;

5.2.6    Any real estate transfer, stamp, recordation or documentary (or other similar) tax(es) (state and local) payable as a result of the transfer of the Property to Purchaser and/or payable in connection with the recording of the Deed; and

5.2.7    Any real estate taxes and assessments, both general and special, as well as any payments-in-lieu of taxes relating to the Property payable prior to the calendar year in which the Closing occurs.

5.3    Intentionally Deleted.

5.4    Taxes.  Real estate taxes and assessments, both general and special, shall be prorated between the parties as of the date the Deed is filed of record based upon the last available tax duplicate and there shall be no further or additional reproration.

16

4386628 .1
34282367v7

5.5    In General.  Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom in Hancock County.

5.6    Intentionally Deleted.

5.7    Purpose and Intent.  Except as expressly otherwise provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section 5 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property through midnight at the end of the day preceding the Closing and Purchaser shall bear all such expenses thereafter.  The provisions of Section 5.4 shall not be merged with the Deed but shall survive Closing.

6.    Notices. Any notice required or permitted to be given hereunder shall be deemed to be given (i) when personally delivered, (ii) two (2) business days after the date of posting if transmitted by United States mail, as registered or certified matter, return receipt requested, and postage prepaid, (iii) one (1) business day after pick-up if transmitted by nationally recognized overnight courier service, or (iv) the date sent if sent by electronic mail prior to 5:00 p.m. eastern time on a business day, in each case addressed to the parties at their respective addresses referenced below:

| | |
|---|---|
| If to Seller: | The Hercules Tire & Rubber Company<br>12200 Herbert Wayne Court, Suite 150<br>Attention: Real Estate Department<br>Email: MGaither@ATD-US.com |
| With a copy to: | Troutman Sanders, LLP<br>301 S. College Street, Suite 3400<br>Charlotte, North Carolina 28202<br>Attention:  Graham S. Miller<br>Email:  graham.miller@troutman.com |
| If to Purchaser: | Nickolas XII, LLC<br>c/o Nickolas L. Reinhart<br>6713 Township Road 212<br>Findlay, Ohio 45840<br>Email: _____ |
| With a copy to: | Eastman & Smith, Ltd.<br>One SeaGate 24th Floor<br>Toledo, Ohio 43604<br>Attention:  Gene R. Abercrombie<br>Email: grabercrombie@eastmansmith.com |

or in each case to such other address as either party may from time to time designate by giving notice in writing to the other party.  Effective notice will be deemed given only as provided above.  Purchaser's and Seller's counsel may send notices on behalf of Purchaser and Seller, respectively.

7.    Closing and Escrow.

7.1    Escrow Instructions.  Upon execution of this Agreement, the parties shall deliver an executed counterpart of this Agreement to the Title Company to serve as the instructions to the Title Company as the escrow holder for consummation of the transaction contemplated herein.  Seller and

17

Purchaser agree to execute such additional and supplementary escrow instructions as may be appropriate to enable the Title Company to comply with the terms of this Agreement, provided, however that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall prevail.

7.2     Seller Deliveries.  Seller shall deliver either at the Closing or by making available at the Property, as appropriate, the following original documents with respect to the Property, each executed and, if required, acknowledged:

7.2.1    The Deed.

7.2.2    An assignment of the Assumed Contracts to Purchaser by way of an assignment and assumption agreement, in the form attached hereto as Exhibit E.

7.2.3    An assignment of all transferable warranties and guarantees then in effect, if any, with respect to the improvements located on the Property or any repairs or renovations to such improvements, which assignment is in the form attached hereto as Exhibit F.

7.2.4    A certificate pursuant to the Foreign Investment in Real Property Tax Act in standard form.

7.2.5    An "Owner's Affidavit", in form reasonably acceptable to the Seller and Title Company and sufficient for the Title Company to delete any exceptions for mechanics' or materialmen's liens arising from work at the Property which is the responsibility of Seller hereunder (subject to the provisions of Section 3.3 hereof).

7.2.6    A gap affidavit, in a form reasonably acceptable to Seller and Title Company, to accommodate a so-called "New York" style closing where the transaction can close and funds can be wired prior to the actual recording of documents.

7.2.7    A certificate dated as of the Closing Date certifying that all of the Seller's representations and warranties set forth in this Agreement remain true and correct in all material respects as of the Closing Date, or if not, specifying the respect in which any such representation or warranty is no longer true.

7.2.8    Such resolutions in form and content as the Title Company may reasonably request evidencing Seller's existence, power and authority to enter into and execute this Agreement and to consummate the transactions herein contemplated.

7.3  Purchaser's Deliveries.   At the Closing, Purchaser shall (i) pay Seller the Purchase Price; and (ii) execute and deliver to Seller the agreements referred to in Sections 7.2.2 and 7.2.3 and any required state and local conveyance tax statements and forms.

7.4     Insurance.  Seller shall terminate its policies of insurance as of noon on the Date of Closing, with respect to the Property, and Purchaser shall be responsible for obtaining its own insurance thereafter.

7.5     Utility Service and Deposits.  Seller shall be entitled to the return of any deposit(s) posted by it with any utility company and Purchaser shall notify each utility company serving the Property to terminate Seller's accounts, effective at noon on the Date of Closing.

18

4386625.1
34282367v7

8.    Default; Failure of Condition.

8.1    PURCHASER DEFAULT.    IF PURCHASER SHALL DEFAULT UNDER THIS AGREEMENT, THE DEPOSIT SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES, AND BOTH PARTIES SHALL BE RELIEVED OF AND RELEASED FROM ANY FURTHER LIABILITY HEREUNDER.  SELLER AND PURCHASER AGREE THAT THE DEPOSIT IS A FAIR AND REASONABLE AMOUNT TO BE RETAINED BY SELLER AS AGREED AND LIQUIDATED DAMAGES IN LIGHT OF SELLER'S REMOVAL OF THE PROPERTY FROM THE MARKET AND THE COSTS INCURRED BY SELLER AND SHALL NOT CONSTITUTE A PENALTY OR A FORFEITURE. NOTWITHSTANDING THE FOREGOING, IN THE EVENT OF A WILLFUL OR INTENTIONAL DEFAULT OF PURCHASER HEREUNDER, SELLER SHALL, IN ADDITION TO THE FOREGOING, BE PERMITTED TO PURSUE ANY AND ALL RIGHTS AND REMEDIES AVAILABLE TO PURCHASER AT LAW OR IN EQUITY.

8.2    SELLER DEFAULT.    IF SELLER SHALL REFUSE OR FAIL TO CONVEY THE PROPERTY AS HEREIN PROVIDED, FOR ANY REASON OTHER THAN (I) A DEFAULT BY PURCHASER OR (II) ANY OTHER PROVISION OF THIS AGREEMENT WHICH PERMITS SELLER TO TERMINATE THIS AGREEMENT OR OTHERWISE RELIEVES SELLER OF THE OBLIGATION TO CONVEY THE PROPERTY, PURCHASER SHALL ELECT AS ITS SOLE REMEDY HEREUNDER EITHER TO TERMINATE THE AGREEMENT AND RECOVER THE DEPOSIT OR TO ENFORCE SELLER'S OBLIGATIONS TO CONVEY THE PROPERTY.  IN ADDITION, IF AND ONLY IF SELLER'S DEFAULT HEREUNDER IS A WILLFUL, INTENTIONAL DEFAULT AND PURCHASER TERMINATES THIS AGREEMENT AS DESCRIBED ABOVE AS A RESULT OF SAME, PURCHASER SHALL BE ENTITLED TO RECOVER FROM SELLER PURCHASER'S REASONABLE, ACTUAL, THIRD PARTY COSTS AND EXPENSES IN CONNECTION WITH THIS AGREEMENT AND PURCHASER'S INSPECTIONS, UP TO A MAXIMUM AGGREGATE AMOUNT OF $50,000.00.

9.    Miscellaneous.

9.1    Entire Agreement.  This Agreement, together with the Exhibits attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

9.2    Severability.    If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

9.3    Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Ohio.

9.4    Assignability.  Purchaser may not assign this Agreement without first obtaining Seller's written consent, except that Purchaser may assign this Agreement to an affiliate of Purchaser.  Any assignment in contravention of this provision shall be void.  No assignment shall release the Purchaser herein named from any obligation or liability under this Agreement.  Any permitted assignee shall be

4386628 .1
342823€7v7

deemed to have made any and all representations and warranties made by Purchaser hereunder, as if the assignee were the original signatory hereto.

9.5    Successors Bound. This Agreement shall be binding upon and inure to the benefit of Purchaser and Seller and their successors and permitted assigns.

9.6    No Public Disclosure. Purchaser shall make no public disclosure of the terms of this transaction without the prior written consent of Seller, except that Purchaser may discuss the transaction in confidence with proposed joint ventures or prospective mortgagees.

9.7    Captions. The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of it provisions.

9.8    Attorneys' Fees.  In the event of any litigation arising out of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs.

9.9    No Partnership. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest.

9.10    Time of Essence. Time is of the essence in this Agreement.

9.11    Counterparts.  This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.  Delivery by facsimile or by electronic transmission in portable document format (PDF) of an executed counterpart of this Agreement is as effective as delivery of an originally executed counterpart of this Agreement.

9.12    Recordation.    Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

9.13    Proper Execution. The submission by Seller to Purchaser of this Agreement in unsigned form shall be deemed to be a submission solely for Purchaser's consideration and not for acceptance and execution.  Such submission shall have no binding force and effect, shall not constitute an option, and shall not confer any rights upon Purchaser or impose any obligations upon Seller irrespective of any reliance thereon, change of position or partial performance. The submission by Seller of this Agreement for execution by Purchaser and the actual execution and delivery thereof by Purchaser to Seller shall similarly have no binding force and effect on Seller unless and until Seller shall have executed this Agreement and a counterpart thereof shall have been delivered to Purchaser.

9.14    Merger.  Except as otherwise expressly provided herein, Purchaser's acceptance of the Deed shall be deemed a discharge of all of the obligations of Seller hereunder and all of Seller's representations, warranties, covenants and agreements herein shall merge in the documents and agreements executed at the Closing and shall not survive the Closing.

9.15    Limited Recourse.  Purchaser agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed direct or indirect member of any Seller or any direct or indirect member, manager officer, director, employee, agent, trustee, shareholder, partner, principal, parent, subsidiary or other affiliate of Seller or any member or manager of any Seller (collectively, the "Seller's Affiliates"), arising out of or in connection with this Agreement or the

20

4386628 .1
34282367v7

transactions contemplated hereby. Purchaser agrees to look solely to Seller's assets directly attributable to the Property for the satisfaction of Seller's liability or obligation arising under this Agreement or the transactions contemplated hereby, or for the performance of any of the covenants, warranties or other agreements of Seller contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's Affiliates with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.

Seller agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed direct or indirect member of Purchaser or any direct or indirect member, manager officer, director, employee, agent, trustee, shareholder, partner, principal, parent, subsidiary or other affiliate of Purchaser or any member or manager of Purchaser (collectively, the "Purchaser's Affiliates"), arising out of or in connection with this Agreement or the transactions contemplated hereby. Seller agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's Affiliates with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.

   9.16   Intentionally Deleted.

   9.17   Survival of Representations and Warranties; Limitation of Liability; Indemnitor. The representations and warranties of Seller set forth in Section 4.1 of this Agreement shall survive the Closing, but written notification of any claim arising therefrom must be received by Seller within twelve (12) months after the Date of Closing or such claim shall be forever barred and Seller shall have no liability with respect thereto. The aggregate liability of Seller with respect to all claims under this Agreement, the transactions contemplated hereby, the performance of any of the covenants, warranties or other agreements of Seller contained herein, and with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby, shall not exceed Six Hundred Eighty-Nine Thousand Five Hundred and No/100 Dollars ($689,500.00) (the "Liability Cap"). In no event shall Seller be liable to Purchaser for any consequential, exemplary, or punitive damages in respect of any such breach.

   9.18   Like-Kind Exchange. Purchaser may be acquiring the Property or Seller may elect to sell the Property as part of an Internal Revenue Code Section 1031 tax deferred exchange. Each party agrees to assist and cooperate in such exchange at no cost, expense or liability to the cooperating party and further agrees to execute any and all documents as are reasonably necessary, in connection with such exchange. The applicable party may be assigning, and is permitted to assign, all contract rights and obligations hereunder to a "qualified intermediary", as that term is defined in the Internal Revenue Code and relevant Treasury regulations, in connection with an exchange. In connection with any such exchange, neither Purchaser nor Seller shall be obligated to acquire or convey any property other than the Property. No such permitted assignment under this Section 9.18 shall relieve either Purchaser or Seller of any liability hereunder.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

4386628.1
34282367v7

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement on the date(s) set forth below, effective as of the date set forth above.

**SELLER:**

**THE HERCULES TIRE & RUBBER COMPANY**,
a Connecticut corporation

By: _____

Name: William F. Ostmann

Title: Vice President + Assistant Treasurer

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

4386628 1
34282367v7

**PURCHASER:**

**NICKOLAS XII, LLC,**
an Ohio limited liability company

_____

Nickolas Reinhart, President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

4386628 .1
34282367v7

An executed copy of this Agreement, together with the Deposit, has been received by the Title Company this _____ day of _____, 2018, and by execution hereof the Title Company hereby covenants and agrees to be bound by the terms of this Agreement which are applicable to the Title Company.

FIDELITY NATIONAL TITLE INSURANCE COMPANY


By: _____
Name: _____
Title: _____

24

4386628 .1
34282367v7

EXHIBIT A
DEPICTION OF LAND



EXHIBIT B
INVENTORY OF PERSONAL PROPERTY

**Inventory List**

Air compressor and hoses
Cardboard boxes
Computers
Cork Boards
Equip batteries
Barrel Fans
Fork trucks
Refrigerator
Ladders
Laptops
Leaf blower
Maint shop tools & supplies
Metal MT Stack Rack
Metal Pass Tire Stack Rack
Microwaves
Mini fridges
Monitors
Printers/Copiers
Miscellaneous Office Supplies
Order pickers
Perm Rack
Ford Pickup Truck with snow plow
Portable heater
Salt bags
Salt Spreader
Shovels
Sky jack
Snow Blower
Snow shovels
Spotter Truck
Sweeper scrubber
Table saw
Telephones
Walkie riders
Walkie Talkies & Batteries
Weed trimmer
Welding torch
White Boards
Composite Pallets

4386628.1
34282367v7

| Type | Make | Model | Serial Number |
|---|---|---|---|
| Forklift (Triple Mast) | Toyota | 8FGCU25 | 68477 |
| Forklift | Toyota | 7FBCU25 | 72465 |
| Forklift | Toyota | 7FBCU25 | 72467 |
| Forklift | Toyota | 7FBCU25 | 72472 |
| Forklift | Toyota | 7FBCU25 | 72474 |
| Forklift | Toyota | 7FBCU25 | 72483 |
| Forklift | Toyota | 7FBCU25 | 72486 |
| Forklift | Toyota | 7FBCU25 | 72492 |
| Forklift | Toyota | 7FBCU25 | 72497 |
| Forklift | Toyota | 7FBCU25 | 72506 |
| Forklift | Toyota | 7FBCU25 | 72586 |
| Forklift | Toyota | 8FGCU25 | 77920 |
| Forklift | Toyota | 8FGCU25 | 77924 |
| Forklift | Toyota | 8FGCU25 | 77985 |
| Turn a Fork | Toyota | 8FGCU25 | 24774 |
| Turn a Fork | Toyota | 8FGCU25 | 78272 |
| Turn a Fork | Toyota | 8FGCU25 | 78307 |
| Elec Clamp (Small) | Toyota | 7FBCU25 | 73347 |
| Clamp (Medium) | Toyota | 8FGCU25 | 78349 |
| Clamp (Medium) | Toyota | 8FGCU25 | 78958 |
| Picker | Raymond | 560-OPC30TT | 560-15-B23643 |
| Picker | Raymond | 560-OPC30TT | 560-15-B23644 |
| Picker | Raymond | 560-0PC30TT | 506-16-A29721 |
| Picker | Raymond | 560-0PC30TT | 506-16-A29736 |
| Picker | Raymond | 560-0PC30TT | 506-16-A29738 |
| Walkie | Raymond | 8410 | 841-15-24355 |
| Walkie | Raymond | 8410 | 841-15-24357 |
| Walkie | Raymond | 8410 | 841-15-24358 |
| Pallet-jack | Yale | MPEO60LCN24T2754 | A803N11522W |
| Scissor Lift | Skyjack | SJ4832 | 870742 |
| Floor Sweeper | Tennant | 8410 | 8410-12653 |
| Spotter/ Yard Truck | Ottawa | Commando | 78693 |
| Freightliner | Ryder | FDTN2TRACIIC | 3AKJGEDUSFSGD8945 |

EXHIBIT C
SCHEDULE OF CONTRACTS

[SEE ATTACHED]

4386625 .1
34282367v7

EXHIBIT D

<u>FORM OF DEED</u>

---

### <u>LIMITED WARRANTY DEED</u>

KNOW ALL PERSONS BY THESE PRESENTS that **THE HERCULES TIRE & RUBBER COMPANY**, a Connecticut corporation ("<u>Grantor</u>"), for the sum of Ten and NO/100 Dollars ($10.00), and other valuable consideration paid, the receipt and sufficiency of which are hereby acknowledged, hereby grants with limited warranty covenants to **NICKOLAS XII, LLC**, an Ohio limited liability company ("<u>Grantee</u>"), whose tax mailing address is _____, certain real property and appurtenances thereto, and described as follows (the "<u>Property</u>"):

**SEE EXHIBIT "A" ATTACHED HERETO**
**AND INCORPORATED HEREIN**

Permanent Parcel Nos.:        _____
Property Addresses:           _____
Prior Instrument References:  _____

To have and to hold the Property with the appurtenances thereof, unto the said Grantee, its successors and assigns forever.

And the said Grantor, does for itself and its successors and assigns, covenant with the said Grantee, its successors and assigns, that the Property is free from all liens and encumbrances made by Grantor except legal highways, governmental ordinances, zoning and building ordinances, easements, reservations, agreements, conditions and restrictions of record, and taxes and assessments due and payable after the date of this deed, and that

4866628 .1
34282367v7

Grantor will warrant and defend said Property, with the appurtenances thereunto belonging, to said Grantee, its successors and assigns, against all lawful claims and demands of all persons claiming by, through or under Grantor, but against none other.

IN WITNESS WHEREOF, the Grantor has signed and sealed these presents as of the ____ day of _____, 2018.

THE HERCULES TIRE & RUBBER COMPANY

By: _____

Print Name: _____

Title: _____

STATE OF _____        )
                                 ) SS:
COUNTY OF _____      )

BEFORE ME, a Notary Public in and for said County and State, appeared _____, the _____ of THE HERCULES TIRE & RUBBER COMPANY, who acknowledges that he/she did sign the foregoing instrument for and on behalf of THE HERCULES TIRE & RUBBER COMPANY and that the same is his/her free act and deed personally and as the _____ of said corporation.

IN TESTIMONY WHEREOF, I have set my hand and official seal, at _____, _____, this _____ day of _____, 2018.

_____
                                        NOTARY PUBLIC

This instrument prepared by:
Matthew T. Viola, Esq.
Kohrman Jackson & Krantz PLL
1375 E. 9th Street, 29th Floor
Cleveland, OH  44114
(216-696-8700)

4386628.1
34282367v7

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

EXHIBIT E
<u>FORM OF ASSIGNMENT AND ASSUMPTION OF CONTRACTS</u>

In consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, THE HERCULES TIRE & RUBBER COMPANY, a Connecticut corporation ("Assignor"), hereby assigns, without representation warranty or covenant, and delegates to NICKOLAS XII, LLC, an Ohio limited liability company ("Assignee"), and Assignee hereby assumes, with respect to all obligations first accruing from and after the date hereof, and accepts the assignment and delegation of all of Assignor's right, title and interest in and to the contracts described on <u>Exhibit A</u> attached hereto relating to certain real property located in Findlay, Ohio, and identified as Parcel ID numbers 350001014311 (approximately 2.2 acres), 350001015765 (approximately 0.768 acres), 630001018541 and 630001018542 (approximately 55.835 acres in the aggregate), 630001022614 (approximately 64.454 acres), and Assignee hereby accepts such assignment.

If any litigation between Assignor and Assignee arises out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such litigation including, without limitation, reasonable attorneys' fees.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the _____ day of _____, 2018.


[SIGNATURES APPEAR ON FOLLOWING PAGE]

**ASSIGNOR:**

**THE HERCULES TIRE & RUBBER COMPANY,**
a Connecticut corporation

By:_____
Name: _____
Title: _____

STATE OF _____
COUNTY OF _____

Before me, a Notary Public in and for said county and state, on this day personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same as the act of _____, as its _____, for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2018.

[SEAL]

_____
[NOTARY TITLE]

My Commission Expires: _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

4386628.1
34282367v7

**ASSIGNEE:**

**NICKOLAS XII, LLC,**
an Ohio limited liability company

_____
Nickolas Reinhart, President

STATE OF OHIO
COUNTY OF _____

Before me, a Notary Public in and for said county and state, on this day personally appeared **Nickolas Reinhart**, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same as the act of Nickolas XII, LLC, as its President, for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2018.

[SEAL]

_____
[NOTARY TITLE]

My Commission Expires: _____

EXHIBIT F

<u>FORM OF ASSIGNMENT OF WARRANTIES AND GUARANTEES</u>

THIS AGREEMENT is made as of the __ day of _____, 2018, THE HERCULES TIRE & RUBBER COMPANY, a Connecticut corporation ("Assignor"), and NICKOLAS XII, LLC, an Ohio limited liability company ("Assignee").

<u>RECITALS:</u>

Assignee has this day acquired from Assignor certain interests in land, buildings and improvements located in Findlay, Ohio, and identified as Parcel ID numbers 350001014311 (approximately 2.2 acres), 350001015765 (approximately 0.768 acres), 630001018541 and 630001018542 (approximately 55.835 acres in the aggregate), 630001022614 (approximately 64.454 acres) (collectively, the "Property").

In consideration of the acquisition of the Property by Assignee and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Assignor hereby assigns, transfers and sets over, without representation, warranty, or covenant, unto Assignee and Assignee hereby accepts from Assignor all of Assignor's right, title and interest in and to all transferable warranties and guarantees, if any, with respect to the improvements located on the Property or any repairs or renovations to such improvements (excluding any Personal Property of Assignor). For purposes hereof, "Personal Property" shall mean all furniture, trade fixtures, racking, personal property, machinery, apparatus, and equipment owned or leased by Assignor and used in the operation, repair and maintenance of the Property, including, but not limited to, the personal property described on Exhibit A attached hereto. For the avoidance of doubt, the building systems (<u>e.g.</u>, HVAC and plumbing) do not constitute Personal Property for purposes of this instrument.

This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor has caused this instrument to be executed as of the date above written.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

4386628 .1
3428236707

**ASSIGNOR:**

**THE HERCULES TIRE & RUBBER COMPANY**,
a Connecticut corporation

By:_____

Name: _____

Title: _____

STATE OF _____

COUNTY OF _____

Before me, a Notary Public in and for said county and state,  on this day personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same as the     act     of     _____,     as     its _____, for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of _____, 2018.

[SEAL]

_____

[NOTARY TITLE]

My Commission Expires: _____

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

4386628 .1
34282367v7

**ASSIGNEE**:

**NICKOLAS XII, LLC**,
an Ohio limited liability company

By:_____

Name: _____

Title: _____

STATE OF _____

COUNTY OF _____

Before me, a Notary Public in and for said county and state, on this day personally appeared _____, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same as the act of _____, as its _____, for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of _____, 2018.

[SEAL]

_____

[NOTARY TITLE]

My Commission Expires: _____

EXHIBIT A

PERSONAL PROPERTY

*AMERICAN LAND TITLE ASSOCIATION*
*OWNER'S POLICY*
*(10-17-92)*

# CHICAGO  TITLE  INSURANCE  COMPANY

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, CHICAGO TITLE INSURANCE COMPANY, a Missouri corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1.  Title to the estate or interest described in Schedule A being vested other than as stated therein;
2.  Any defect in or lien or encumbrance on the title;
3.  Unmarketability of the title;
4.  Lack of a right of access to and from the land.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

*In Witness Whereof,* CHICAGO TITLE INSURANCE COMPANY has caused this policy to be signed and sealed as of Date of Policy shown in Schedule A, the policy to become valid when countersigned by an authorized signatory.

Issued by:
NORTHWEST TITLE AGENCY
OF OHIO AND MICHIGAN, INC.
328 N. ERIE STREET
TOLEDO, OHIO 43624
PHONE: (419) 241-8195

CHICAGO TITLE INSURANCE COMPANY

By: _____

President

By: _____

ATTEST

Secretary

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy; or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or

   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

      (a) to timely record the instrument of transfer; or

      (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## CONDITIONS AND STIPULATIONS

### 1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

### 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

### 5. PROOF OF LOSS OR DAMAGE

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

### 6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

**(a) To Pay or Tender Payment of the Amount of Insurance.**

To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

**(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.**

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

### 7. DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or;

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increases the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this Policy is subject to the following:

(i) where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii) where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

### 8. APPORTIONMENT

If the land described in Schedule A consists of two or more parcels which are not used as a single site, and a loss is established affecting one or more of the parcels but not all, the loss shall be computed and settled on a pro rata basis as if the amount of insurance under this policy was divided pro rata as to the value on Date of Policy of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy, unless a liability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time of the issuance of this policy and shown by an express statement or by an endorsement attached to this policy.

### 9. LIMITATION OF LIABILITY

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

### 10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto.

### 11. LIABILITY NONCUMULATIVE

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy to the insured owner.

### 12. PAYMENT OF LOSS

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

### 13. SUBROGATION UPON PAYMENT OR SETTLEMENT

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies in the proportion which the Company's payment bears to the whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(b) The Company's Rights Against Non-Insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation by reason of this policy.

### 14. ARBITRATION

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

### 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

### 16. SEVERABILITY

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

### 17. NOTICES, WHERE SENT

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at the issuing office or to:

Chicago Title Insurance Company
Claims Department
171 North Clark Street
Chicago, Illinois 60601-3294



# Chicago Title Insurance Company

328 NORTH ERIE STREET, TOLEDO, OHIO  43624

Phone:    (419) 241-8195
Fax:       (419) 241-9302

June 14, 2005

OHE HERCULES TIRE & RUBBER COMPANY, A CONNECTICUT CORPORATION
14801 COUNTY ROAD 212
FINDLAY, OHIO 45840

RE:   Order Number  25981664        TOL
       TOLEDO-LUCAS COUNTY PORT AUTHORITY
·to·   THE HERCULES TIRE & RUBBER COMPANY, A CONNECTICUT CORPORATION

       14801 COUNTY ROAD 212
       FINDLAY, OHIO 45840

Enclosed herewith, please find the following documents in connection with the purchase of the above referenced
property:

     xOwner's Title Insurance Policy and any Endorsements thereto, insuring your ownership in the property.

     Your Owner's Title Insurance Policy protects you from loss caused by defects in the title to the property you
     purchased, and remain in effect forever at no additional cost to you.  This is a valuable document and should be
     kept in a safe place with your other valuable papers.  You can feel secure in the knowledge that you have
     protected yourself against financial loss caused by title defects.

     We will retain your file in our data base, so that we can facilitate any future transactions, and enable us to give you
     the best possible rates when you sell your property.  We would like to thank you for the opportunity of serving
     you, and hope that you will contact our office for your future closing and title insurance needs.

     Very truly yours,
     CHICAGO TITLE INSURANCE COMPANY

     SEC

SC2
OWNLTR 10/02/01-ch

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE A

Policy No. 25981664  TOL          Date of Policy  May 10, 2005          Amount of Insurance:
                                                at                      $13,000,000.00

1. NAME OF INSURED:

   THE HERCULES TIRE & RUBBER COMPANY, A CONNECTICUT CORPORATION

2. THE ESTATE OR INTEREST IN THE LAND WHICH IS COVERED BY THIS POLICY IS:

   SEE EXHIBIT "A" ATTACHED

3. TITLE TO THE ESTATE OR INTEREST IN THE LAND IS VESTED IN:

   The Insured, who acquired title in

4. THE LAND REFERRED TO IN THIS POLICY IS DESCRIBED AS FOLLOWS:

                              SEE ATTACHED EXHIBIT "B"

   14801 COUNTRY ROAD 212, FINDLAY, OH 45840

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE B (Continued)

Policy No. 25981664   TOL

EXHIBIT "A"

LEASEHOLD ESTATE AS EVIDENCED BY A MEMORANDUM OF LEASE BETWEEN THE
TOLEDO-LUCAS COUNTY PORT AUTHORITY, AS LESSOR, AND THE HERCULES TIRE &
RUBBER COMPANY, AS LESSEE, DATED NOVEMBER 1, 1998, DELIVERED AS OF NOVEMBER
12, 1998 AND FILED FOR RECORD NOVEMBER 12, 1998 IN VOLUME 1674, PAGE 335,
HANCOCK COUNTY, OHIO OFFICIAL RECORDS.

OPBCON 09/15/57-0?

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE A - ITEM 4 - LEGAL DESCRIPTION (Continued)

Policy No. 25981664

EXHIBIT "B"

SITUATED IN THE CITY OF FINDLAY AND IN THE TOWNSHIP OF MARION, COUNTY OF HANCOCK AND STATE OF OHIO, AND BEING A PART OF THE NORTHEAST 1/4 OF SECTION 4, TOWN 1 NORTH, RANGE 11 EAST, A TRACT OF LAND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A MONUMENT FOUND MARKING THE NORTHEAST CORNER OF THE NORTHEAST 1/4 OF SECTION 4;

THENCE ALONG THE EAST LINE OF SAID NORTHEAST 1/4, ALSO BEING THE CENTERLINE OF COUNTY ROAD NUMBER 236, SOUTH 00° 06' 52" WEST, A DISTANCE OF 990.07 FEET TO A ONE INCH IRON PIN SET;

THENCE PARALLEL WITH THE NORTH LINE OF THE NORTHEAST 1/4 OF SECTION 4, NORTH 89° 13' 38" WEST, A DISTANCE OF 2,678.40 FEET TO A ONE INCH IRON PIN SET ON THE WEST LINE OF SAID NORTHEAST 1/4 OF SECTION 4;

THENCE ALONG SAID WEST LINE, NORTH 00° 35' 15" EAST, A DISTANCE OF 990.01 FEET TO A MONUMENT SET MARKING THE NORTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 4;

THENCE ALONG THE NORTH LINE OF SAID NORTHEAST 1/4, ALSO BEING THE CENTERLINE OF TOWNSHIP ROAD NUMBER 212, SOUTH 89° 13' 38" EAST, A DISTANCE OF 2,670.22 FEET TO THE **POINT OF BEGINNING** AND CONTAINING 60.780 ACRES OF LAND, MORE OR LESS, OF WHICH 58.886 ACRES LIE IN THE CITY OF FINDLAY, AND 1.894 ACRES LIE IN MARION TOWNSHIP, SAID TRACT SUBJECT HOWEVER, TO ALL LEGAL HIGHWAYS AND PRIOR EASEMENTS OF RECORD.

SAID PROPERTY NOW KNOWN AS LOTS ONE (1) AND TWO (2) IN THE PLAT OF **TALL TIMBERS 2ND ADDITION**, AS PLATTED IN BOOK 20, PAGE 269, HANCOCK COUNTY PLAT RECORDS.

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE B

Policy No. 25981664    TOL

## EXCEPTIONS FROM COVERAGE

THIS POLICY DOES NOT INSURE AGAINST LOSS OR DAMAGE (AND THE COMPANY WILL NOT PAY COSTS, ATTORNEYS' FEES OR EXPENSES) WHICH ARISE BY REASON OF:

**GENERAL EXCEPTIONS:**

1. Rights or claims of parties in possession not shown by the public records.
2. Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.
3. Easements or claims of easements not shown by the public records.
4. Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.
5. Taxes or special assessments which are not shown as existing liens by the public records.

**SPECIAL EXCEPTIONS:**

*AL*     6. ITEMS 1 THROUGH 5, INCLUSIVE, OF SCHEDULE B, AS SET FORTH ABOVE, ARE HEREBY DELETED.

*G*     7. THE PLAT OF TALL TIMBERS 2ND ADDITION WAS RECEIVED FOR RECORD MARCH 28, 2001 AND RECORDED IN HANCOCK COUNTY RECORD OF PLATS VOLUME 20, PAGE 269.

     NOTE:  SEE PLAT FOR LINES.

*H*     8. PIPELINE RIGHT OF WAY TO STANDARD OIL COMPANY, OF RECORD IN DEED VOLUME 248, PAGE 343, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

     NOTE:  THE ABOVE RIGHT OF WAY WAS ASSIGNED TO INLAND CORPORATION, OF RECORD IN DEED VOLUME 248, PAGE 681.

*I*     9. RIGHT OF WAY EASEMENT TO HANCOCK-WOOD ELECTRIC COOPERATIVE, OF RECORD IN DEED VOLUME 271, PAGE 499, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

*J*     10. OIL AND GAS LEASE TO MASTERS OIL COMPANY, OF RECORD IN LEASE VOLUME 51, PAGE 73, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

*K*     11. EASEMENT TO BOARD OF HANCOCK COUNTY COMMISSIONERS, OF RECORD IN OFFICIAL RECORDS VOLUME 2224, PAGE 803, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

*L*     12. TEMPORARY EASEMENT TO BOARD OF HANCOCK COUNTY COMMISSIONERS, OF RECORD IN OFFICIAL RECORDS VOLUME 2224, PAGE 807, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

Countersigned by Authorized Signatory

_____
Authorized Signatory

OPB-12/28/98 tlt

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE B (Continued)

Policy No. 25981664   TOL

M   13. DECLARATION OF RESTRICTIONS OF RECORD IN OFFICIAL RECORDS VOLUME 2117, PAGE 2117, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO, AND AMENDMENTS/SUPPLEMENTS OF RECORD, IF ANY, BUT OMITTING ANY COVENANT OR RESTRICTION BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS OR NATIONAL ORIGIN UNLESS AND ONLY TO THE EXTENT THAT SAID COVENANT (A) IS EXEMPT UNDER CHAPTER 42, SECTION 3607 OF THE UNITED STATES CODE OR (B) RELATES TO HANDICAP BUT DOES NOT DISCRIMINATE AGAINST HANDICAPPED PERSONS.

AA   14. INTERCREDITOR AGREEMENT OF RECORD IN VOLUME 1675, PAGE 92, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

AB   15. ATTORNMENT AND NON-DISTURBANCE AGREEMENT CERTIFICATE BETWEEN TOLEDO-LUCAS COUNTY PORT AUTHORITY AND CHASE MANHATTAN TRUST COMPANY, N.A. AND DIRECTOR OF DEVELOPMENT OF THE STATE OF OHIO AND THE HERCULES TIRE & RUBBER COMPANY, RECORDED NOVEMBER 12, 1998 AT 3:06 PM, OF RECORD IN VOLUME 1675, PAGE 114, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO, AS INSTRUMENT NUMBER 17870.

N   16. WE DO NOT AFFIRMATIVELY INSURE THE QUANTITY OF ACREAGE SET FORTH IN THE DESCRIPTION CONTAINED IN SCHEDULE "A", HEREOF.

P   17. MORTGAGE FROM TOLEDO-LUCAS COUNTY PORT AUTHORITY, FILED NOVEMBER 12, 1998 AT 2:48 PM, IN THE ORIGINAL AMOUNT OF $5,000,000.00, TO CHASE MANHATTAN TRUST CO., N.A., TRUSTEES, OF RECORD IN MORTGAGE VOLUME 1675, PAGE 1, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

NOTE:  THE ABOVE MORTGAGE WAS ASSIGNED TO FIFTH THIRD BANK OF NORTHWESTERN, OHIO, OF RECORD IN MORTGAGE VOLUME 1675, PAGE 124.

NOTE:  AMENDMENT AND RESTATED ASSIGNMENT OF MORTGAGE, OF RECORD IN MORTGAGE VOLUME 1735, PAGE 62.

NOTE:  THE PRESENT AMOUNT DUE SHOULD BE DETERMINED BY CONTACTING THE CURRENT OWNER OF THE DEBT.

Q   18. MORTGAGE FROM TOLEDO-LUCAS COUNTY PORT AUTHORITY, FILED NOVEMBER 12, 1998 AT 2:50 PM, IN THE ORIGINAL AMOUNT OF $8,350,000.00, TO DIRECTOR OF DEVELOPMENT OF THE  STATE OF OHIO, OF RECORD IN MORTGAGE VOLUME 1675, PAGE 31, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

NOTE:  THE PRESENT AMOUNT DUE SHOULD BE DETERMINED BY CONTACTING THE CURRENT OWNER OF THE DEBT.

S   19. FINANCING STATEMENT BETWEEN THE HERCULES TIRE & RUBBER COMPANY, BEING THE DEBTOR, AND TOLEDO-LUCAS COUNTY PORT AUTHORITY, BEING THE SECURED PARTY, FILED FOR RECORD NOVEMBER 12, 1998 AT 2:56 PM, AS FILE NO. 50143, RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

NOTE:  THE ABOVE FINANCING STATEMENT WAS ASSIGNED TO CHASE MANHATTAN TRUST CO., N.A.

OFRCON-05/15/97-bt

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE B (Continued)

Policy No. 25981664   TOL

T   20. FINANCING STATEMENT BETWEEN TOLEDO-LUCAS COUNTY PORT AUTHORITY, BEING THE
    DEBTOR, AND CHASE MANHATTAN TRUST COMPANY, N.A., BEING THE SECURED PARTY,
    FILED FOR RECORD NOVEMBER 12, 1998 AT 2:59 PM, AS FILE NO. 50144,
    RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

U   21. FINANCING STATEMENT BETWEEN TOLEDO-LUCAS COUNTY PORT AUTHORITY, BEING THE
    DEBTOR, AND DIRECTOR OF DEVELOPMENT STATE OF OHIO, BEING THE SECURED PARTY,
    FILED FOR RECORD NOVEMBER 12, 1998 AT 3:01 PM, AS FILE NO. 50145,
    RECORDER'S OFFICE, HANCOCK COUNTY, OHIO.

Y   22. TERMS AND CONDITIONS OF THE LEASE EVIDENCED BY MEMORANDUM OF LEASE BETWEEN
    TOLEDO-LUCAS COUNTY PORT AUTHORITY, LESSOR, AND HERCULES TIRE & RUBBER
    COMPANY, LESSEE, FILED FOR RECORD DECEMBER 12, 1998 AT 2:46 PM, OF RECORD
    IN OFFICIAL RECORDS VOLUME 1674, PAGE 335, RECORDER'S OFFICE, HANCOCK
    COUNTY, OHIO.

    NOTE:  AT THE TIME SAID LEASE WAS EXECUTED TOLEDO-LUCAS COUNTY PORT
    AUTHORITY WAS IN TITLE TO CAPTION PREMISES.

Z   23. ASSIGNMENT OF CERTAIN RIGHTS UNDER A LEASE BY TOLEDO-LUCAS COUNTY PORT
    AUTHORITY, FILED FOR RECORD NOVEMBER 12, 1998 OF RECORD IN
    OFFICIAL RECORDS VOLUME 1675, PAGE 76, RECORDER'S OFFICE, HANCOCK COUNTY,
    OHIO, AS INSTRUMENT NUMBER 17868.

AD  24. TAXES AS TO PARCEL NUMBER 63-1018541, (VALUATIONS OF LAND $167,130.00;
    BLDG. $847,260.00; TOTAL $1,014,390.00), FOR THE YEAR 2004, IN THE AMOUNT
    OF $38,133.94, OF WHICH THE FIRST HALF IN THE AMOUNT OF $19,066.97, ARE
    PAID IN FULL; TAXES FOR THE LAST HALF IN THE AMOUNT OF $19,066.97, ARE A
    LIEN, BUT ARE NOT YET DUE AND PAYABLE.

    NOTE:  THERE WAS A PAYMENT OF $872.66 MADE ON SECOND HALF OF THE YEAR 2004
    TAXES, LEAVING A BALANCE OF $18,194.31.

AE  25. TAXES AS TO PARCEL NUMBER 63-1018542 (VALUATIONS OF LAND $67,380.00; BLDG.
    $700.00; TOTAL $68,080.00) FOR THE YEAR 2004, IN THE AMOUNT OF $2,561.94,
    OF WHICH THE FIRST HALF IN THE AMOUNT OF $1,280.97, ARE PAID IN FULL; TAXES
    FOR THE LAST HALF IN THE AMOUNT OF $1,280.97, ARE A LIEN, BUT ARE NOT YET
    DUE AND PAYABLE.

AF      TAXES AND SPECIAL ASSESSMENTS AS TO PARCEL NUMBERS 63-1018541 AND
    63-1018542, FOR THE YEAR 2005, AMOUNTS UNDETERMINED, ARE A LIEN, BUT ARE
    NOT YET DUE AND PAYABLE.

AP      ADDITIONS AND ABATEMENTS, IF ANY, WHICH MAY HEREAFTER BE MADE BY LEGALLY
    CONSTITUTED AUTHORITIES ON ACCOUNT OF ERRORS, OMISSIONS OR CHANGES IN THE
    VALUATION.

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE B (Continued)

Policy No. 25981664   TOL

A2    26. EXCEPTION IS TAKEN TO THE FOLLOWING MATTERS AS SHOWN ON THE SURVEY PREPARED
BY PETERMAN ASSOCIATES, INC., DATED MAY 6, 2005, PROJECT/ORDER NO. 05-0321.

1. SETBACK LINES

2. BP PIPELINE EASEMENT ACROSS NORTH SIDE OF PROPERTY

3. COLUMBIA GAS TRANSMISSION LINE ACROSS WEST SIDE CORNER OF THE PROPERTY

4. RETENTION POND ON LOT TWO (2).

5. UTILITY AND DRAINAGE EASEMENTS ALONG SIDES OF PROPERTY.

6. STORM SEWERS, SANITARY SEWERS, WAER LINES, CATCH BASINS, FIRE HYDRANTS
AND WATER VALUES AS SHOWN ON THE SURVEY.

7. ALL EASEMENTS, STRUCTURES, WIRES, SIGNS, POLES, CURBS, SEWERS, GAS
LINES, WATER LINES, MANHOLES, DUCTS, AND OTHER MATTERS WITHIN THE RIGHT OF
WAY OF COUNTY ROAD NO. 236.

# CHICAGO TITLE INSURANCE COMPANY
## OWNER'S FORM
### SCHEDULE B (Continued)

Policy No. 25981664   TOL

AH

### PART II OF SCHEDULE B

IN ADDITION TO THE MATTERS SET FORTH IN PART I OF THIS SCHEDULE, THE TITLE
TO THE ESTATE OR INTEREST IN THE LAND DESCRIBED OR REFERRED TO IN SCHEDULE
A IS SUBJECT TO THE FOLLOWING MATTERS, IF ANY BE SHOWN, THAT THE COMPANY
INSURES THAT SUCH MATTERS ARE SUBORDINATE TO THE LIEN OR CHARGE OF THE
INSURED MORTGAGE UPON SAID ESTATE OR INTEREST:

NONE

OFFCON-05/15/97-ec

ENDORSEMENT

Attached to and made a part of

Order No. 25981664

Issued by

# CHICAGO TITLE INSURANCE COMPANY

Endorsement 13 (Leasehold-Owners)

1. As used in this endorsement, the following terms shall mean:

   a. "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case, as a result of a matter covered by this policy.

   b. "Lease": the lease agreement described in Schedule A.

   c. "Leasehold Estate": the right of possession for the Lease Term.

   d. "Lease Term": the duration of the Leasehold Estate, including any renewal or extended term if a valid option to renew or extend is contained the Lease.

   e. "Personal Property": chattels located on the land and property which, because of their character and manner of affixation to the land, can be severed from the land without causing appreciable damage to themselves or to the land to which they are affixed.

   f. "Remaining Lease Terms": the portion of the Lease Term remaining after the insured has been Evicted as a result of a matter covered by this policy.

   g. "Tenant Leasehold Improvements": Those improvements, including landscaping, required or permitted to be built on the land by the Lease that have been built at the insured's expense or in which the insured has an interest greater than the right to possession during the Lease Term.

2. The provision of subsection (b) of Section 7 of the Conditions and Stipulations shall not apply to any Leasehold Estate covered by this policy.

3. Valuation of Estate of Interest Insured

   If, in computing loss or damage, it becomes necessary to value the estates or interests of the insured as the result of a covered matter that results in an Eviction, then that value shall consist of the value of the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction. The insured claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements valued eight as a whole or separately. In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

Endorsement 13 (Leasehold-Owners)
Page 2

4.  Additional items of loss covered by this endorsement:

If the insured is Evicted, the following items of loss, if applicable, shall be included in computing loss or damage incurred by the insured, but not to the extent that the same are included in the valuation of the estates or interests insured by this policy.

a.  The reasonable cost of removing and relocating any Personal Property that the insured has the right to remove and relocate, situated on the land at the time of Eviction, the cost of transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation, and the reasonable cost of repairing the Personal Property damaged by reason of the removal and relocation.

b.  Rent or damages for use and occupancy of the land prior to the Eviction, which the insured as owner of the Leasehold Estate is obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.  The amount of rent that, by the terms of the Lease, the insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the insured has been Evicted.

d.  The fair market value, at the time of the Eviction, of the estate or interest of the insured in any lease or sublease made by the insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.  Damages that the insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease made by the insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements caused by the Eviction.

f.  Reasonable costs incurred by the insured to secure replacement leasehold equivalent to the Leasehold Estate.

g.  If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction. Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering fees, construction management fees, costs of environmental testing and reviews, landscaping costs and fees, costs and interest on loans for the acquisition and construction.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the fact amount thereof.

CHICAGO TITLE INSURANCE COMPANY

Authorized Signature

ALTA Endorsement Form 13 (Leasehold-Owners) (10/31/01)

ENDORSEMENT

Attached to and made a part of

Order No. 25981664   TOL

Issued by

## CHICAGO TITLE INSURANCE COMPANY

ACCESS ENDORSEMENT

The Company hereby assures the Insured that the Premises abut physically open dedicated public streets or rights of way known as  Township Road 236.

The Company hereby insures the Insured against losses which said Insured shall sustain in the event that the assurances hereinabove shall prove to be incorrect.

This endorsement is issued as part of the Policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the Policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the Policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the Polic and of any prior endorsements.

CHICAGO TITLE INSURANCE COMPANY
By:

_____
President.

Attest:

_____
Secretary.

_____
Authorized Signatory

*Note: This endorsement shall not be valid or binding until countersigned by an authorized signatory.*

ENDORSEMENT
Attached to Policy No. 25981664
Issued By
CHICAGO TITLE INSURANCE COMPANY

The Company hereby insures the insured against loss which the insured shall sustain by reason of any inaccuracy in the following assurance.

The land described in Schedule A of said policy is the same as that delineated on the plat of survey by Peterman Associates, Inc., dated May 6, 2005, Project/Order No. 05-0321.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

CHICAGO TITLE INSURANCE COMPANY

By: _____

ENDORSEMENT

Attached to and made a part of

Order No. 25981664   TOL

Issued by

## CHICAGO TITLE INSURANCE COMPANY

**TAX PARCEL SPECIAL ENDORSEMENT**

The Company hereby insures the insured against loss or damage by reason of any inaccuracy in the following assurance:

The land under caption herein is completely covered by Tax Identification No.   63-1018541  &  65-1018542

This endorsement is issued as part of the Policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the Policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the Policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the Policy and of any prior endorsements.

CHICAGO TITLE INSURANCE COMPANY
By:

_____
Authorized Signatory

*Note: This endorsement shall not be valid or binding until countersigned by an authorized signatory.*

President.

Attest:

Secretary.

NENTAXP 01/04/05-1M

**ENDORSEMENT**
ATTACHED TO POLICY NO. 25981664
ISSUED BY
**CHICAGO TITLE INSURANCE COMPANY**

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (c) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or knowledge, as of Date of Policy, of Lawrence B. Seawell, Joseph Recchia, Craig E. Anderson, Robert Keller and Michael Distel, whether or not imputed to the insured by operation of law, provided of Lawrence B. Seawell, Joseph Recchia, Craig E. Anderson, Robert Keller and Michael Distel, acquired the insured as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**CHICAGO TITLE INSURANCE COMPANY**

By: _____
     Authorized Signatory